United States v. Radford. Mr. Mullins. Thank you and may it please the court my name is Brian Mullins I represent the appellant Regina Radford in this case. Ms. Radford was in the middle of a cross-country train trip from Flagstaff Arizona to Toledo Ohio when two police officers from the Galesburg Illinois Police Department boarded the train in the Galesburg train station. They went to Ms. Radford's sleeper car. It was the smallest sleeper car that Amtrak offers which is about three and a half by six and a half feet. They asked Ms. Radford what they described as security questions. They told her that they were investigating for people transporting narcotics on the train. They were uniformed officers wearing canine unit hats and one of the officers identified himself as affiliated with the DEA. The officers asked Ms. Radford if she was carrying any drugs, guns, or money. She said no. The officer then asked Ms. checked your bags to confirm everything that you told us is true. Ms. Radford said I guess so you're just doing your job. The officers then searched the bag and seized heroin from the bag. We are arguing that Ms. Radford was seized for purposes of the Fourth Amendment. I don't understand that. They had reason to suspect that she was involved in drug trade. Not enough basis to arrest her or seize her. But I don't think they had enough suspicion to warrant just asking her whether she would cooperate with them. She didn't have to. Well the question is whether... Didn't intimidate her, did they? We believe that when they asked her to confirm that what she was telling them was true that at that point a reasonable person would not feel free to refuse the officer's request given the circumstances of her cross-country train travel that she was in an isolated rural Illinois train station 400 miles from her destination and 1,500 miles from her point of departure and that the officers had already suggested to her that she was the target of their investigation which indeed she was. Then so whether there was reasonable suspicion or not is one of the issues in this case. The district court didn't address that issue. I think the district court... They didn't say you're the target of the investigation. They just said we're investigating drug trafficking. Correct. I think a reasonable inference is that a person would think that they were a target and that's what... Only if they were actually doing it. Well if asked whether you are carrying drugs, guns, or money and you don't see any other passengers ask the same questions I think it's reasonable... Yeah but it's completely out of the way. There aren't there's nobody else around. Correct and there were no other passengers that were visible. It's the evidence is undisputed that Ms. Radford did not see any other passengers questioned because the officers did not question any other passengers. They testified to that. So one of the issues is whether the officers had reasonable suspicion to seize Ms. Radford. But they didn't seize her. Well and that's the second question whether she was seized. We're arguing... She wasn't seized. They said you know could we look at your purse or whatever and she said yes. Why is that a seizure? Police can never ask a question of a person without a warrant. Is that what you said? That's the implication of your position. No I don't think... You must always have a warrant. I don't think we go that far. I think it's unique to the circumstances. I don't see anything unique. Police officer asks a question of someone and there's an incriminating answer and there's a harmless answer and they give the incriminating answer. I don't see what that has to do with seizure. Well we believe that the seizure really the case crossed the line from a consensual encounter to a seizure when the officer asked her to search the bag to confirm that what she was saying was true. And given that reasonable people at this point know that complying with security regulations when they're traveling is a condition of continuing on their journey, we believe that a reasonable person at that point would not feel free to say no. And that's what the court is looking at. Because a reasonable person would not feel, would not believe that they could continue on their trip if when presented... Would she rather be arrested? Well I think... I mean she knows what's in what's in her bag or whatever it is. And that suggests that she didn't feel that she was free to say no because a reason a person would say no knowing that what was in their bag if they thought that they were free to say no. What do you mean free to say no? What does that mean? That she would... That they're gonna slap her if she says no? That she would otherwise be allowed to continue on her trip. Well what do you mean? You mean they're gonna stop the train and take her off if she says no? I thought your argument was that just as you'll be denied boarding an airplane if you don't consent to the search of your carry-on luggage, that a reasonable person, which is the test according to the Supreme Court, would react similarly in cross-country train traffic at this point. Correct. And people know that complying with the security... But the train is moving, isn't it? At this point it was stopped in the train station for five to ten minutes in Galesburg, which is 160 miles from Chicago. And so the train is stopped briefly for its scheduled stop. So did she think that if she said no they would drag her off the train? I think... Did she testify to that? I think she did not testify. And it's not her what she subjectively believes. So why do we think that she would have thought she was going to be dragged off the train if she didn't say yes? Because the officer said it was necessary to confirm that what she said was true. The officers were not taking her word at face value. The officers had to confirm that what she said was true. They asked her another question. But they weren't compelling her to answer yes. Well, I don't think it's any different than the situation... Do you think nobody would have answered no? I think there are... We... The evidence was that some people do answer no. Yes, some people will answer no. I think... So they're free to answer no. And they make a decision, yes or no. I don't see where Cesar answered no. I think under Ms. Radford's circumstances, where she is in the middle of this long train trip, and she's been on the train for a day, a reasonable person would not feel free to say no. Aside from that issue... But if she says yes, she knows she's going to be arrested. How can that be a superior choice from her standpoint? She doesn't know what will happen if she says no. She knows with what will happen if she says yes. It's not a superior choice, but... And I think that's why it suggests... It's an extremely inferior choice, right? You choose to be arrested versus you choose maybe to be, I don't know, told to leave the train? I don't know. And that's why I think it suggests that she didn't feel that she was free to say no, because it wasn't a rational response. What does it mean not to be free to say no? What did she think would happen to her if she said no? That she would not continue on her trip. What do you mean? They drag her out of the train? I think that's reasonable. Because she said no? I think that's what a person could think. I mean, if you're in an airport... But the police wouldn't do that, because they would be totally squelched by her lawsuit. Right? Well, if you're in an airport... The police would be put in a very awkward position if they drag, if in these circumstances, they drag someone off a train. I think if you're in an airport and you say no... They've committed battery, right? They've committed battery. False imprisonment. If you're in an airport and you say no... They lose their badges. They lose their badges. The government is telling us that they would have been perfectly justified in doing that. Correct. And we do not believe that this court's cases support reasonable suspicion to have seized Ms. Radford. Now, aside from whether she was seized... Well, I certainly agree with that. But there seems to be room for debate from the government. Aside from whether she was seized, the court could find that she was not seized, but still find that her consent was not voluntary. And that's our second issue. And that's based on whether the Schneckloth case... What does that mean? Consent not voluntary. That it was not a product of her free choice, but was a product of coercion. No, what you're saying... No, that's not what I'm saying. That's not what you're saying. You're saying any time someone who's asked a question by the police and gives an incriminating answer, that person is not speaking freely. Not any time. Yes, any time. What's special about her? I think what's not anything special about her, but what's special about... That no one would say no. Well, what we know is what she did say. And when you're looking at... Yeah, but that doesn't help you at all. If you're simply acquiescing to a show of authority, then that is not valid consent, is it? Correct. And that's what we believe her statement shows when she said, I guess so, you're just doing your job. It's very similar to the statement in Worley. Yeah, the problem I have, Mr. Mullins, here is, in essence, the fact that she didn't testify. We've got good argument by counsel on this sort of thing, but I don't... But she doesn't testify to say, in essence, yes, I was intimidated by the authority. I didn't think I could leave, etc. Should I be troubled by that? I understand. On the first issue, whether she was seized, that's a reasonable person test, so I don't think her subjective feelings matter. But you buy completely, then, into the officer's testimony about the circumstances, right? Yeah, I think the facts are undisputed as far as what occurred. On the consent issue, her statement to the officer, I believe, is enough for the court to find that her consent was not voluntary. I think that statement speaks for itself. Well, it could be enough, but this district judge found otherwise. Correct. It feels like a question of fact. But the district judge did not indicate that it was applying the burden of proof to the government. There's no statement that the district court said, well, the government has met its burden by a preponderance. Is there an indication to the contrary? I think there's just no indication. It doesn't appear that the court applied that standard. Why did the government have the burden of proof? The government has the burden of proof to show that they seized this heroine. Why do they have a burden of proof to show that she wasn't intimidated? Well, they have the burden of proof to show that consent is voluntary, and that's pretty long-established case law, I believe. I don't get that. I don't understand that. I don't get that. I think the rationale is— Every time someone says something, the government has to prove that it was a voluntary statement? If there's no warrant, I think the fallback position is that it's the government's burden. There's no fallback position. There's no seizure. That's what I don't get. You're pushing too hard. This is not a seizure of anything. It's just a question. Well, and as we said, I understand the court's position on seizure. The court can also find that she did not consent voluntarily, whether she was seized or not. And I'll reserve any time I have left for rebuttal. Okay, thank you. Mr. Mullins? Good morning, Your Honors. May it please the Court. Sagan Phillips on behalf of the United States. Your Honors, the facts in this case, as found by the district court, demonstrate that we have a consensual encounter that ended with Ms. Radford voluntarily consenting to the search of her luggage. And I know there's a disagreement with regard to the voluntary consent about a standard of review that should apply. But, quite frankly, under any standard of review, the government wins because under either one, the facts, as found by the district court, are given clear error of deference. And so it's worth going through what those facts of the district court found are. The district court found that the encounter here happened in the middle of the day. Officer Mings, who's 5'8", 165 pounds, which is pretty much exactly my size, did not block the door but stood to the side of it and just peeked in. And found that he gave the impression of just a routine check through the questioning, through his statements, that he immediately returned Ms. Radford's ticket, that he made no show of force, no threats or commands, he didn't even use an authoritative or intimidating tone. Well, the best argument she could make, although I don't think she made it or that her lawyer thinks she made it, her best argument would be that the reason I said yes was that I knew or I thought that if I said no, they'd go ahead and search. That's right. That would be the best thing she could say. And interestingly, I had a discussion about that same question. Why ever do people say yes? There's the possibility that by saying yes, they hope that they won't search because they said yes, or maybe that by saying yes, they won't engage in maybe as thorough a search. Those are possibilities. But either way, the review, at least, of that is. The other alternative is that the entire encounter is structured carefully by the police in order to stay just within the boundaries or a little over the boundaries set by the Supreme Court for these kinds of encounters, but is designed to overcome the will of the civilian who's targeted for this inquiry. So I would agree with the first part, and I would agree also that the officer's intent in going through it is certainly to get them to consent to a search. That's true of any case where you ask for consent to search, and there's no difference. They did stay within the law in this case. They asked only sort of rudimentary questions that the district court found were. Why wouldn't it be appropriate to say that to get a valid consent to a search, the police have to explicitly say you're not required to consent to the search? So I think that essentially that has been. What we look at is the totality of the circumstances. Whether or not that was said is certainly one of those circumstances, but I think if we look at Schneckloth, if we look at other cases, there's no requirement for a specific statement. Right. We've been seeing the war on drugs and the damage it's done to Fourth Amendment rights for generations now, without apparent success in the war against drugs, right? As far as I know, prices aren't going sky high because of the government's success in interdicting supplies. So perhaps it might be time to reconsider some of these standards and say, look, if you're going to count on consent, let's make sure it's really valid consent, as opposed to the kinds of intimidation and games playing that the police can engage in to try to get people to consent. Just tell them, you don't have to. And I think Your Honor's point was discussed in Schenckloth, and I recognize that it's changed, but something that hasn't changed are the countervailing issues or concerns that the Supreme Court dealt with in that case, which is, on the one hand, you want police to ferret out crime. We do. And on the other hand, there's a necessity for the security of a person and to not be bothered by the police, and I recognize those. But even if we accept that, okay, from now on we need... Well, isn't the assumption of the voluntary consent finding is that the person understood that they were not required to consent, correct? If you don't understand that, it's hard to see how it's voluntary, right? So this is one of those interesting questions. It reminds me of Justice Frankfurter's statement that voluntariness is a salamander, sort of hard to get your hands on. But the court dealt with this in Schenckloth where they compare the voluntariness in the context of the Fifth Amendment and voluntariness in the context of the Fourth Amendment, and whether or not the government needs to show as a matter of proof that this person, this individual, knew of their right, and the court rejected that in the context of the Fourth Amendment. Now, obviously, if we look at Miranda and others, the Fifth Amendment would apply that standard of voluntariness, no question. Let me try to ask my question again. I understand that the Supreme Court took that totality of the circumstances approach, but would you agree that a finding of voluntariness necessarily assumes the person understood they could have said no? Yes. Okay. So what would be wrong, impractical, about saying, let's at least make sure that the person knows they can say no? I think the issue with that is taking into account the sort of rapid-fire aspects that happen in day-to-day policing, and that's, in fact, what the court took into account when comparing the... If I could ask again, are you really sure? I'm sorry? If I could ask again for the second time, are you really sure you meant? Right. So that's why we look, of course, at the totality. She was in a box. I don't think it excuses her at all, but she guesses that they didn't just ask her randomly, that they picked her out to ask this question because they were suspicious. Knowing that, she also knows that if she says no, you can't talk to me or something. Well, when she arrives and wherever she's going, she's going to find police asking questions from other people. What are you doing here? Do you know this person? Right?  But I think it shows as a practical matter why even the guilty may decide the jig is up. If I don't let them search now, they're going to be following me around until I slip. And that's possibly right. It's important to note that in the context of the consensual counter itself, though what we actually look at is a reasonable innocent person. And so whether or not a reasonable innocent person engaging in this communication with the police would feel that way, I know I wouldn't, but I'm obviously very comfortable with law enforcement, so I may not be the reasonable person in this regard. Oh, I think a person who knew that she was innocent would consent. Right. And that's, of course, a slightly different question. The voluntariness of the consent is pretty much been held to be a question of fact. In this case, the court basically went through the same analysis. I mean, the same facts instruct on both questions. But here, on a clear error standard, if you look at the fact that there was no intimidation, no coercion, no threatening or intimidating tone of voice, the way the questions were asked, of course, as Judge Hamilton pointed out, the questions are designed to gain familiarity and then ultimately to gain confidence. Well, in some situations, maybe not this one, but in some situations, the individual figures that it's so well hidden they're not going to find it. Yes, and that brings up sort of my prior point, which is maybe they figure that by consenting, they won't do a deep search that they otherwise would find a reason to do if they didn't. So the heroin was in a bag? Within a bag? It was in two bags. It was both in her purse and in what's- Cosmetic bag. Cosmetic bag, which I do not believe was in the purse, but it was in two different bags. Your theory here is that a reasonable person in Ms. Radford's position would have felt free to just close the door and end the encounter, right? Or even not to close the door, but to say, I'm done. I don't want to have this discussion. Was she in a compartment? Find some other way to- How often does that happen? Was she in a compartment? So the- Was she in a compartment? She was in the compartment. In the compartment- With other people or all by herself? So the compartment that she was in was a sleeper. It was a roomette, if you will. It was fairly small. There was testimony that there were people in other cars, but not necessarily in the hallway. To answer your question, Judge Hamilton, and I apologize, I see I'm out of time, but on page 25 of the transcript, Officer Mings testifies that, in fact, people did say no, and that when they did, he said, okay, have a nice day. But there was no testimony specifically about the frequency of that, but it was clear that that did happen. If there are no other questions, the government will rest on its grace. Okay. Thank you, Mr. Phillips. Mr. Mullins, do you have anything further? Just to clarify the court's question, Ms. Radford was alone in the compartment. To get at the other issue of police not informing suspects of their right to refuse consent, it's not required. We acknowledge that. But it is a factor to consider whether consent is voluntary, and I think it's a factor that courts weigh fairly heavily. There's also this issue of what the standard of review is on the voluntariness of consent. It appears that there's some inconsistency in the case law on that issue. We believe that the proper standard of review is the NOVO, and that standard is consistent with the Ornelas case. And it just makes sense, from a practical standpoint, where you have the district court in the best position to find what the facts are, the historical facts. And when you look at voluntariness, you're looking at what the historical facts are, and then weighing those against the legal standard of whether those facts meet a voluntary confession or a voluntary consent. So we believe that the court should apply the NOVO standard. Under that standard, we believe that Ms. Radford's consent was not voluntary. Okay. Well, thank you very much to both counsel.